1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
2                      CENTRAL DIVISION

3

4   UNITED STATES OF AMERICA,      .
                                   . Docket No. 4:20-CR-00046-JM-1
5   PLAINTIFF,                     .
                                   .
6   VS.                            . Little Rock, Arkansas
                                   . March 10, 2021
7   DESHAON TERRELL ASKEW,         . 11:50 a.m.
                                   .
8   DEFENDANT.                     .
    . . . . . . . . . . . . . . .  .
9

10

11                        TRANSCRIPT OF

12                    REVOCATION HEARING

13          BEFORE THE HONORABLE JEROME T. KEARNEY

14              UNITED STATES MAGISTRATE JUDGE

15

16

17

18  ELECTRONIC COURT RECORDER-OPERATOR:  Ms. LaShawn Coleman

19

20  Transcription Service:           Robin Warbritton
                                     Post Office Box 262
21                                   Vilonia, AR  72173

22

23

24  PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25  TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

2

```
 1   APPEARANCES:

 2   For the Government:      Ms. Joan Shipley
                              U.S. Attorney's Office
 3                            Eastern District of Arkansas
                              Post Office Box 1229
 4                            Little Rock, AR  72203-1229

 5   For the Defendant:       Mr. J. Blake Byrd
                              Federal Public Defenders Office
 6                            The Victory Building
                              1401 West Capitol Avenue
 7                            Suite 490
                              Little Rock, AR  72201
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

I N D E X

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| GOVERNMENT'S WITNESS: | | | | |
| Tanya Glass | 7 | 9 | 15 | 15 |
| | | | | |
| DEFENDANT'S WITNESS: | | | | |
| Deshaon Terrell Askew | 20 | 23 | | |

4

P R O C E E D I N G S

(Call to order of the Court.)

THE COURT:  Good morning and please be seated.

MS. SHIPLEY:  Good morning, Your Honor.

MR. BYRD:  Good morning, Your Honor.

THE COURT:  Okay.  The first case on the docket is *United States of America v. Deshaon Terrell Askew*.  This is case number 4:20-CR-00046.

The history of the case is that Mr. Askew appeared for plea and arraignment before this Court on June 15 last year.  He was charged in Count 1 with being a felon in possession of a firearm; Count 2, possession with intent to distribute hydromorphone; Count 3, possession with intent to distribute morphine; and Count 4, possession of a firearm in furtherance of drug trafficking.

At the arraignment, the Government sought detention. The Defendant was detained and remanded to the custody of the U.S. Marshals pending a bond hearing.

Then, on July 10, his counsel filed a motion for bond and it was referred by Judge Moody.  A hearing was set for July 17, but his counsel filed a motion to withdraw that request until a new release plan was scheduled.

On July 28, his counsel filed a motion again requesting a bond hearing.  And a hearing was held on August 13.  At that hearing, upon agreement of the parties, the Court

1  determined that the Defendant would be released on standard

2  and special conditions.  He was released to be transported

3  immediately to Crowley's Ridge in Jonesboro, Arkansas for

4  inpatient treatment, followed by Chem Free living until trial.

5       On January 15 of this year, the Government filed a

6  motion for summons and to revoke his bond.  A hearing was held

7  on January 27th.  Defendant admitted to the allegations and

8  the Court found that he had, in fact, violated his conditions

9  of release.  Nonetheless, the Court ordered him to be released

10  again into inpatient treatment, followed by Chem Free living

11  until trial.

12       Then, on February 9, the Government again filed a

13  motion to revoke and asked for a summons.

14       And these are the allegations:

15       That on February 6th of this year, he was discharged

16  from the Gyst House for having an unauthorized cell phone

17  while in treatment.

18       The Defendant reported to the Probation Office that

19  he was discharged on February 8th for not being able to work

20  in the Detail Shop.

21       A bond revocation hearing was scheduled for February

22  24; however, the Court received a report from the Pretrial

23  Services Officer that he had tested presumptively positive for

24  narcotics before the hearing and, per court policy, the

25  Defendant was detained until he tested clean.  And that's why

6

we're here today, to continue that hearing.

         And so, I want to make sure, first of all, Mr. Askew,
you can hear me; is that correct?

         THE DEFENDANT:  I can hear you, sir.

         THE COURT:  Okay.  All right.

         Mr. Byrd, after my reading of the allegations, does
your client admit or deny the allegations?

         MR. BYRD:  He denies them, Your Honor.

         THE COURT:  He denies them.  Okay.

         All right.  Ms. Shipley, would you like to call a
witness or --

         MS. SHIPLEY:  I would, Your Honor.

         THE COURT:  Okay.

         MS. SHIPLEY:  We would call Officer Glass.

         THE COURT:  All right.

    (TANYA GLASS, GOVERNMENT'S WITNESS, SWORN.)

         MS. SHIPLEY:  Your Honor, would you prefer that I
approach the podium or --

         THE COURT:  No, you can speak from right there --

         MS. SHIPLEY:  Okay.

         THE COURT:  -- as long as you speak into the
microphone.

         MS. SHIPLEY:  Thank you.

         THE COURT:  Okay.

                         DIRECT EXAMINATION

1  BY MS. SHIPLEY:

2  Q    Officer, would you state your name for the record, please?

3  A    Tanya Glass.

4  Q    And, Officer Glass, you have been supervising Deshaon

5  Terrell Askew for a while; is that correct?

6  A    Yes.

7  Q    When did your supervision begin?

8  A    Whenever he was released September 14th, 2020.

9  Q    Okay.  And we're here specifically about new allegations

10 with a cell phone and having been released from the Gyst

11 House.  Can you tell the Court what you were notified happened

12 at the Gyst House?

13 A    I received a text message from Mr. Askew advising that he

14 was discharged from the Gyst House for not being able to cut

15 it in the Detail Shop.  Then, upon further investigation, I

16 talked to Ruben, who ran the facility, and he sent -- he sent

17 me some -- the discharge paperwork saying that there was an

18 unauthorized cell phone.

19 Q    Okay.  And had you had communication with Mr. Askew while

20 he was at the Gyst House?

21 A    I had.

22 Q    And what kind of communication did you have with him?

23 A    He sent me text messages.

24 Q    And text messages from what phone?

25 A    The cell phone that he had originally had.

Glass - Direct                                                  8

1   Q   Okay.  And so, the Gyst House had discovered that cell

2   phone; is that correct?

3   A   As far as I know, yes.

4   Q   Okay.  And so, he -- but he had been sending you text

5   messages on a cell phone that he denies having; is that

6   correct?

7   A   Yes.

8   Q   Okay.  And if I may, also, last time we were in court, you

9   were going to --

10          MS. SHIPLEY:  And, Judge Kearney, if you'll tell me

11  if I'm overstepping where I should go right now and I'll back

12  off, but I know that the Court had asked that the drug tests

13  be sent off for verification.

14          THE COURT:  Right.

15          MS. SHIPLEY:  And I -- I'm happy to ask Officer Glass

16  about that now with the Court's permission.

17          THE COURT:  Yes.  Go ahead.

18          MS. SHIPLEY:  Okay.

19  BY MS. SHIPLEY:

20  Q   Officer Glass, did you send off the two tests, I think --

21  or the actual tests that we were in here last on, on February

22  14th?

23  A   Yes, I sent three of them off.  The January 5th, 2021, the

24  one that he admitted to; January 27th, 2021, which was the

25  first revocation hearing; and then the second hearing that we

Glass - Direct                                                    9

1   had, that Mr. Askew was detained, on February 24, 2021.

2   Q   Okay.  And just as a matter of refreshing my memory as

3   well, on the first revocation hearing that we had when he

4   tested positive, did -- did he tell you when he had last used?

5   A   January 3rd, 2021.

6   Q   Okay.  And when he was in here on February 24th, on his

7   admittance sheet, when did he tell you he had last used?

8   A   January 15th, 2021.

9   Q   Okay.  So, he -- he admitted that he had used again after

10  the January 3rd, correct?

11  A   Correct.

12  Q   Okay.  And when you sent it off, what verification did you

13  receive?

14  A   I received an interpretation report stating that the

15  offender reused marijuana prior to each of the collections

16  listed, which would be January 27th, 2021 and February 24th,

17  2021.

18  Q   Okay.  So neither test was residual then?

19  A   Correct.

20  Q   Okay.

21        MS. SHIPLEY:  I'll pass the witness, Your Honor.

22        THE COURT:  All right.  Mr. Byrd?

23        MR. BYRD:  Thank you, Your Honor.

24                    CROSS EXAMINATION

25  BY MR. BYRD:

Glass - Cross                                          10

1   Q    Officer Glass, so I understand that he texted you from the

2   Gyst House.  Now, is -- Mr. Ruben at the Gyst House, he -- he

3   didn't seize a phone from him?  I mean, you don't have really

4   any information on that, do you?

5   A    He didn't what now?  I'm sorry.

6   Q    Take a phone from him?

7   A    Seize?  Okay.

8   Q    Or see a phone?

9   A    I didn't know if you said see or seize.  I'm sorry.  Not

10  that I'm aware of.

11  Q    So, because a second ago, you testified that -- that your

12  response to whether he had a phone was, "As far as I know."

13  That's what you testified to a second ago?

14  A    Correct.

15  Q    So, you're not exactly certain if he had his own phone,

16  specifically, in the facility?

17  A    Correct.  It was just his number that he was texting me

18  from.

19  Q    Fair enough.  I'd be silly if I didn't have somewhere to

20  go with that.

21  A    Right.

22  Q    Do you -- are you familiar with an app called the

23  "TextNow" app?

24  A    I'm not familiar with that one.

25  Q    Are you familiar with technology that can be placed on

Glass - Cross                                                11

1  smart phones, like "WhatsApp," and stuff like that?

2  A    Yes.

3  Q    And so, is it possible that he could have accessed an

4  account through his phone number via an app on somebody else's

5  phone?

6  A    It is possible.

7  Q    Okay.  The date that -- but to be fair, you have no idea

8  one way or the other if -- if that's what happened, but it's

9  possible?

10 A    Correct.

11 Q    Okay.  The violation is from February -- February -- let's

12 see -- he was discharged on February 8th.

13 A    February 6th, I believe.

14 Q    February 6th?

15 A    He reported to me on the 8th.

16 Q    Okay.  Thank you.  Wasn't that Super Bowl Sunday, around

17 about?  Was that Super Bowl Sunday?

18 A    I believe it was a Saturday that he was discharged.  I

19 believe February 6th was a Saturday.

20 Q    Okay.

21 A    I may be completely wrong on that.  I don't have a -- I

22 don't have a date, like a calendar.

23          THE DEFENDANT:  (Indiscernible.)

24          MR. BYRD:  Thanks, Deshaon, but just -- just be quiet

25 for me.

BY MR. BYRD:

Q   Well, do you know anything about pizzas being ordered at -- at the Gyst House?

A   Just what he -- he had told me prior to court on February 24th, whenever he was trying to explain everything.  And I told him that he just needed to -- to talk to you about it.

Q   Right.  Okay.  Well, so, I mean, it's possible that he accessed the app from someone else's phone, so it's -- so it's possible that he didn't actually have a phone of his own in the facility?

A   It is possible, yes.

Q   And is it possible -- now I know that he said to you that he was discharged for not being able to work in the Detail Shop, but there's also some confusion about whether or not he got in trouble or somebody got in trouble for ordering pizzas on a telephone.  Is it possible that he was just a little confused about why he was getting kicked out?

A   I guess.  I -- honestly, I don't know.  I just know what I was told from him and what I was told -- the letter from Mr. Ruben.

Q   Thank you.  Let's talk about some good things.  I mean, when he was released last September, he was doing pretty well until the funeral, the use --

A   Correct.

Q   -- the marijuana use?

1    A    Yes.

2    Q    Was he working?

3    A    He was.

4    Q    So he finished the 30 day inpatient --

5    A    Uh-huh.

6    Q    -- residential portion?

7    A    Yes.

8    Q    Stepped down to the Chem Free?

9    A    Yes.

10   Q    It's my understanding there was a woman there who runs it,

11   who didn't have any problems with Mr. Askew really.  I -- it

12   sounds like he was doing pretty well; is that fair to say?

13   A    Yeah.  Whenever I would do treatment staffings with --

14   with his counselor, while he was in inpatient, they were good

15   reports.

16   Q    So, for about four months or so, doing okay, working; he

17   was working in a restaurant as a cook?

18   A    Yes.

19   Q    Okay.  With respect to the test, this new use allegation,

20   you said he admitted he used on -- did you say he -- he

21   admitted that he used like a new use on January 15th?

22   A    That's what the admission form -- whenever he was here on

23   February 24th, that's what the admission form stated, he

24   signed it as the -- a new use on January 15th.

25   Q    Obviously, I don't have an expert witness here today, and

Glass - Cross                                        14

1   I'm not a chemist or a biologist, but my client is a pretty

2   big guy; is that fair to say?

3           MR. BYRD:  My apologies, Mr. Askew.

4   BY MR. BYRD:

5   Q   He's a big guy?  He's probably over six foot.  You know, I

6   mean, it's fair to say, judicial notice, he's a big guy?

7   A   Correct.

8   Q   And so, if he used on the 15th, I understand that -- that

9   the -- that there is a positive on February 24th, but February

10  24th would be -- I mean, they say that marijuana can be in the

11  system for up to four weeks or so; is that right?

12  A   Yeah, something like that, 30 -- 30 days or so, maybe a

13  little more.

14  Q   Maybe a little more or --

15  A   Maybe a little less.

16  Q   -- maybe a little less?

17  A   Correct.

18  Q   And the 24th of February is about six weeks after his last

19  admission of use?

20  A   Do what?  I'm sorry.  What?

21  Q   The 24th of February would be about six weeks after his

22  last admission of use on the 15th of January?

23  A   Yeah, just about.

24          MR. BYRD:  I'll pass the witness, Your Honor.

25          THE COURT:  All right.

1                           REDIRECT EXAMINATION

2   BY MS. SHIPLEY:

3   Q   Officer Glass, do you know if Mr. Ruben gives -- people

4   that are discharged there, does he give them the same letter

5   that he gives you, stating why he has been discharged?

6   A   I honestly don't know.  This letter was actually addressed

7   to Mr. Byrd.

8   Q   Okay.

9   A   And I just got a copy of it.

10  Q   Okay.  So you're not aware if they're given paperwork?

11  A   I'm not aware, no.

12  Q   Okay.  Okay.  But your paperwork didn't refer to anything

13  about the Detail Shop; is that correct?

14  A   Correct.

15          MS. SHIPLEY:  Okay.  No further questions, Your

16  Honor.

17          THE COURT:  I just want clarification -- oh, go

18  ahead, did you have another question?

19          MR. BYRD:  Just briefly.

20          THE COURT:  Yes.  Go ahead.  Go ahead.

21          MR. BYRD:  Unless you want to go.

22          THE COURT:  No.  No.  No.  No.  Go ahead.

23                          RECROSS EXAMINATION

24  BY MR. BYRD:

25  Q   I forgot to ask, were there any like rules that he signed

1  up for, signed on, you know, did he -- did he sign to abide by

2  specific expressly written rules before he entered into the

3  Gyst House?

4  A   I did not get a copy of those, so I'm not aware.

5  Q   Okay.  Oh, I forgot to ask you this.  Is there a bed

6  waiting for him back at Crowley's Ridge, potentially for --

7  for March 29th?

8  A   It's March 13th, I believe.

9  Q   Oh, it's even sooner?

10 A   I believe so, yes.  They -- I think they moved the date

11 up.

12 Q   So, if the Court were inclined to give him a chance to

13 return to a contract facility, is it fair to say the contract

14 facilities, there's a little more predictability, you have a

15 better relationship, the rules are more clear, as opposed to

16 say Gyst House?

17 A   That's fair to say, yes.

18 Q   Okay.  Thank you.

19         MR. BYRD:  No further questions.

20         THE COURT:  My question has to do with I believe your

21 reports, upon direct testimony, from the labs indicated there

22 was new use based upon the last reported test.  Right?

23         THE WITNESS:  Uh-huh.  Yes.

24         THE COURT:  In other words, and -- and when they say

25 there is new use, what do they base that on?

                    Glass - By the Court                    17

1            THE WITNESS:  I actually have the report if you'd

2    like to look at it.  It -- it tells the -- the --

3            THE COURT:  Do they do nanogram levels?

4            THE WITNESS:  Yes.  They're -- it's all lined out

5    here in the -- the numbers.  Honestly, I don't know, I just

6    read the report.

7            THE COURT:  I mean, I've heard this type of testimony

8    before --

9            THE WITNESS:  Correct.  Yes.

10           THE COURT:  -- but it's -- it's based upon -- they

11   can say if the nanogram levels have -- have gone up from the

12   last test, that's new use; is that correct?

13           THE WITNESS:  Right.  Or if they haven't went -- they

14   haven't went down.

15           THE COURT:  Right.  Okay.

16           THE WITNESS:  And it's broken down into this report

17   if you'd like a copy of it.

18           THE COURT:  No, I just --

19           THE WITNESS:  Okay.

20           THE COURT:  -- wanted to see if you had the report

21   and if it suggested that.

22           THE WITNESS:  Yes, sir.

23           THE COURT:  Okay.  All right.  If anyone wants to ask

24   questions based upon my questions, you're free to.

25           MR. BYRD:  No, sir.

1    THE COURT:  All right.

2    MS. SHIPLEY:  No, Your Honor.

3    THE COURT:  That's all I have for you.  Thank you.

4    THE WITNESS:  Okay.

5    (Witness steps down.)

6    THE COURT:  Mr. Byrd, I suppose you see your client

7  with his finger up.  I don't know --

8    MR. BYRD:  Mr. Askew, I -- I would just stay quiet

9  for now.  Okay?

10    THE DEFENDANT:  (No audible response.)

11    THE COURT:  Okay.  Well, first of all, are there any

12  more witnesses for you, Ms. --

13    MS. SHIPLEY:  No, Your Honor.

14    THE COURT:  Okay.

15    MS. SHIPLEY:  No, Your Honor.

16    THE COURT:  Mr. Byrd?

17    MR. BYRD:  None for the defense, Your Honor.

18    THE COURT:  Okay.  Okay.  So you don't want him to --

19  he's not testifying?

20    MR. BYRD:  Well, if he wants to --

21    THE COURT:  I mean --

22    MR. BYRD:  -- he has that right.  I -- I was --

23    THE COURT:  You're --

24    MR. BYRD:  Mr. Askew, do you want to speak on this

25  issue?  You'll be cross examined by the --

19

1          THE DEFENDANT:  Oh, yes, sir.

2          THE COURT:  If so, you're going to be cross examined.

3          MR. BYRD:  I just -- thank you, Judge.

4          THE COURT:  All right.

5          MR. BYRD:  You'll be cross examined by the

6    prosecutor.  And you need to understand that.

7          THE DEFENDANT:  Okay.

8          THE COURT:  All right.  Go ahead.

9          THE DEFENDANT:  Well, I was --

10          MR. BYRD:  Let me -- let me just --

11          THE DEFENDANT:  -- I was -- well --

12          MR. BYRD:  Mr. Askew, let me -- let me pause for a

13    second.  Do you want -- let me ask you a question, do you want

14    to clarify the circumstances of your release from Gyst House

15    or the incident with Gyst House?

16          THE DEFENDANT:  Yes, sir.

17          MR. BYRD:  Okay.

18          THE DEFENDANT:  Yes, sir.  You know --

19          MR. BYRD:  Then tell --

20          THE DEFENDANT:  -- (indiscernible).

21          MR. BYRD:  Let me -- let me speak.  Let's not speak

22    over each other.

23          And, Your Honor, I'll put him on for the limited

24    purpose of explaining his -- his -- you know, issues at the

25    Gyst House.

1                              DIRECT EXAMINATION

2    BY MR. BYRD:

3    Q   Go ahead, Mr. Askew.  Tell Judge Kearney what happened at

4    the Gyst House.

5    A    Sir, the day that she said that they discharged me, they

6    discharged me Monday morning after the Super Bowl.  It's a guy

7    -- well, it's a guy in the Gyst House that has privileges,

8    that they had they phone.  One guy came in and told me, he

9    said that he was ordering pizza for the Super Bowl.  He said

10   he'd rather it be four, and he said that if I wanted to order

11   something, he will order it for me, I'd just have to pay him

12   back.  I told him I've got my own money, he could order me a

13   pizza.  He ordered the pizza.  And we have smoke breaks.  I

14   went out with the first group for a smoke break, and he went

15   out with the second group.  I came in and they -- there was a

16   knock before (indiscernible, someone clears their throat and

17   drowns out Mr. Askew's voice on the recording) the pizza from

18   the pizza man, because I couldn't talk to the females and tell

19   them to tell the guy to come to the door to get the pizza.  I

20   said, "Okay, well, I'll pay for the pizza.  When they get off

21   their smoke break, maybe they'll pay me back."  In the process

22   of me getting my money back, Vince walked in, and that's the

23   guy that runs the Gyst House.  He -- he asked if -- he asked

24   the ladies, he said, "Oh, y'all have pizza.  Who ordered

25   pizza?"  They said, "Deshaon."  I said, "No."  He said, "What

                         Askew - Direct                    21

1  you mean no?"  I said, "Man, I didn't order no pizza."  He
2  said, "Okay.  You didn't order pizza, but you have pizza, and
3  you're getting money for pizza, so who ordered the pizza?"  I
4  didn't say nothing, and the guy that ordered the pizza didn't
5  say anything.  So, he said, "Now, I'm going to ask again, who
6  went to the door and got the pizza?"  They said, "Deshaon."
7  "Who paid for the pizza?"  The ladies said, "Deshaon."  I
8  said, "Sir, I never ordered pizza."  He said, "So where the
9  phone at?"  I said, "I don't have a phone."  He said, "You had
10 to have a phone to order the pizza because you have the
11 pizza."  He said, "You had the -- you had the pizza out."  I
12 said, "Sir, I never ordered the pizza."  He said, "Okay."  And
13 he walked off.
14 Q   Okay.
15 A   I looked up the next morning, Monday morning, Ms. Lavonta
16 (phonetic), the receptionist lady, she came in with a paper,
17 told me to sign it, me and two other guys, and said that you
18 guys been discharged.  And I said, "For what?"
19 Q   Okay.
20 A   She said, "I don't know.  Vince told me to kick y'all out
21 today, this morning."
22 Q   Okay.  Let --
23 A   So, I got kicked out Monday morning.  It wasn't Saturday
24 or none of that.
25 Q   Okay.

Askew - Direct                                              22

1   A    It was Monday.

2   Q    Thank you for clarifying that.  Let me just ask you a

3   question.  Did you sign any -- did you have any written rules,

4   or anything like that, that you were presented with when you

5   checked into Gyst House?

6   A    No, sir.  I -- I signed for the 250, I gave them 250

7   bucks, I signed a paper saying that I -- I gave them my

8   admission fee.  And I was signing for -- for what -- I guess

9   whatever went on at the Gyst House was between me and the Gyst

10  House.  They wasn't supposed to give out no information of my

11  treatment or none of that.  That was it.  That was all.

12  Q    But you also thought that --

13  A    And I was told that --

14  Q    You also thought that --

15  A    And I also --

16  Q    Go ahead.

17  A    And I also signed a paper to work at the Detail Shop for

18  25 dollars a day, and that was supposed to pay my rent.  And

19  due to me being a diabetic, I have to use the washroom.  He

20  wasn't having it.  He said that I was working too slow and I

21  used the bathroom, so he couldn't have me working at the shop.

22  So he didn't have me working at the Detail Shop.  He had me at

23  the Gyst House.

24  Q    Okay.  Is that -- so, is that why you thought you were

25  discharged for not being able to work in the Detail Shop?

Askew - Direct                                          23

1   A   Yes.  Because of --

2   Q   Because of your diabetes?

3   A   -- what he say, and they discharged me --

4   Q   Okay.

5   A   -- that's what I thought that, you know, they was kicking

6   me out, because I couldn't work in the shop, because he told

7   me that I couldn't pay -- he said, "How are you gonna pay your

8   rent" --

9   Q   Okay.

10  A   -- "if you cannot work?"

11  Q   Mr. Askew, let's wrap up real quick.  Let me just ask you

12  a couple of things.  If you're given an opportunity to return

13  to Crowley's Ridge, are you intending to abide by all the

14  rules, all the written rules, go back to work, and comply with

15  all conditions of release?

16  A   Yes, sir.

17  Q   Okay.

18          MR. BYRD:  Pass the witness.

19          MS. SHIPLEY:  Judge, I will go to the podium so he

20  can see me.

21          THE COURT:  Okay.  All right.

22          MS. SHIPLEY:  I don't think that's kind of fair to be

23  talking and he can't see me.

24          THE COURT:  Right.

25                      CROSS EXAMINATION

                            Askew - Cross                        24

1   BY MS. SHIPLEY:

2   Q    Mr. Askew, can you hear me okay?

3   A    Yes, ma'am.

4   Q    Okay.  I just want to ask you a few questions based on

5   what you just told Mr. Byrd.  Were you given oral -- did they

6   tell you what the rules were of the Gyst House?

7   A    No, ma'am.  They -- well, yeah -- well, basically, you

8   know, when you go to class -- well, they call them meetings.

9   They tell you everything at the meetings.  They tell you that

10  you can't have visits.  You have to work for privileges.

11  Every two weeks you get privileges, from smoke privileges, to

12  use a cell phone, or to use, you know, to get -- order food.

13  I have to go every two weeks to get my privileges, you know,

14  to fill my privileges out.

15  Q    Okay.  And so, were you told that you were not allowed to

16  have a phone during that meeting?

17  A    Told me that I wasn't allowed to have any -- for 30 days,

18  I wasn't allowed to have type of communication with my family,

19  or nothing -- nothing like that.

20  Q    Okay.  So -- so you were aware that was the rule, correct?

21  A    Yes, ma'am.

22  Q    Okay.  So, did you use somebody -- did you have a phone in

23  the Gyst House?

24  A    No, ma'am.  I used the -- the guy's phone that had -- I

25  put the app on his phone to get in contact with Mr. Byrd and

1  Ms. Curry due to trying to find out what day would I be --

2  that I need out of there, because I was sitting there until my

3  bed space opened at Crowley's Ridge.

4  Q   So -- so you had the ability -- you had the ability to

5  communicate through somebody else's phone?

6  A   Yes, ma'am.

7  Q   Okay.

8  A   And I know I was wrong, but I was trying to keep in

9  contact with Mr. Byrd and Ms. Curry, trying to figure out what

10  day did I need to go to Crowley's Ridge or go to another

11  facility that they had  -- that you guys had a contract with.

12  Q   Okay.  But if you needed to, you could have also

13  communicated with your family, correct?

14  A   Yes, ma'am, but --

15  Q   Okay.  That's all.

16  A   -- I didn't.

17        MS. SHIPLEY:  That's all I have, Your Honor.  Thank

18  you.

19        THE COURT:  Any redirect?

20        MR. BYRD:  No, Your Honor.

21        THE COURT:  All right.  Any other witnesses?

22        MR. BYRD:  None for the defense.

23        THE COURT:  Okay.  All right.  I am -- I do find that

24  Mr. Askew has violated the conditions set by the Court, in

25  that he has used drugs since we were last here.  He showed up

1   here for the revocation hearing with drugs in his system.  And

2   I find that the lab reports, which suggests that he -- that's

3   new use, clearly indicates that he has used since the last

4   admission of his use.

5          I also find that he violated my conditions, because,

6   very specifically, when he was last here, I found that he was

7   in violation, but, nonetheless, and based upon his

8   representations through his lawyer that he could do better if

9   allowed another opportunity, I allowed him to go to the Gyst

10  House.  So, I did do that.  And it's on him to make sure that

11  he follows whatever rules there are, so that he doesn't get

12  kicked out, because the order specifically said he was to be

13  there until trial or otherwise being placed somewhere else.

14  So, that didn't happen.  He ends up getting kicked out.

15         Now, I've heard his excuses, but he's also admitted

16  to, you know, using somebody's phone with an app on it to --

17  to do things.  Also, I think his testimony was that he wasn't

18  supposed to order food and you have to earn a privilege to do

19  that, and he admits that he was ordering a pizza through

20  somebody else.  The bottom line is, he got kicked out of a

21  program that I somewhat reluctantly allowed him to go into.

22         So, I have -- after finding that he's violated the

23  terms, I now want to hear argument from counsel as to what I

24  should do about it.  Obviously, I could do nothing, leave it

25  as it is; I could modify his conditions; or I could revoke him

1   and detain him.

2           So, let me hear from you first, Ms. Shipley.

3           MS. SHIPLEY:  Your Honor, the Government has concerns

4   that this Defendant was given a second chance at the last

5   hearing, the Court allowed him to go to a rehab.  My concerns

6   are his dishonesty in some of this.  I don't know that -- you

7   know, he assured the Court today that if he were allowed to

8   go, he would follow their rules, but that's what he also

9   assured the Court the last time he was in here.

10          So, we're asking that he be detained at this point,

11  Your Honor.  I don't know that -- that there are conditions

12  that the Court could impose on him that he would comply with,

13  and -- and would we be back in here in a month, given his

14  history.

15          And I do acknowledge that prior to allowing him to

16  travel, he -- he did well for about six months after getting

17  out of the rehabilitation that he was in.  But I think that he

18  has shown through his actions since December that he is not

19  following the rules again.  So the Government would have

20  concerns about his release.

21          THE COURT:  All right.  Mr. Byrd?

22          MR. BYRD:  Your Honor, I'm asking that he be able to

23  release to Crowley's Ridge, return to Crowley's Ridge where he

24  did so well before, and get back into that program.  His trial

25  date is set in August.  You know, we're a good ways away.

28

1  That's five months away.

2          You expressed concern about the Gyst House because it

3  was non-contract.  I remember that.  And I think the concern

4  is obvious, they're not contract, we don't really know what

5  the rules are.  He -- he was honest when he -- under cross

6  examination, he admitted to using someone else's phone, he

7  admitted that there were privileges and things.  And so, I --

8  I don't -- you know, he was honest about that.

9          Given the ambiguity of the rules at Gyst House, and

10  the fact that he did really well before at Crowley's Ridge,

11  I'm just asking the Court to allow him to -- to have a chance

12  at another contract facility where things are a lot more

13  clear, the lines of communication are established and open

14  between the facility and Pretrial.  And he was working the

15  whole time before.  He was doing what he was supposed to do.

16  The -- the original use that set all this whole chain of

17  events in motion, concerning about using in Chicago when he

18  went for the funeral for his mom, and that was a violation,

19  but you know the context of it, it is -- it is mitigating, I

20  would say.

21          And so, you know, I think all things considered, he's

22  worthy of -- of one more chance to get back into a contract

23  facility and do as well as he had previously been doing,

24  because it -- it really -- did he have his own phone there at

25  Gyst House?  No.  Did he use someone else's?  Yes.  And that

29

1   person was allowed to have it.  So, I mean, I just think that

2   there's some gray area and some ambiguity about the rules and

3   things that -- that are worth considering as you make a

4   decision in this matter.

5            THE COURT:  All right.  Thank you.

6            And, Mr. Byrd, as always, you're a -- you're a

7   convincing and very good lawyer, but, you know, in this

8   situation, needless to say, as you will recall and you've

9   already recounted, at that last hearing I found that he was in

10  violation.  And he had made some admissions regarding that.

11  And I was hesitant to release him.  Remember, I was saying,

12  "I'm just going to detain him until we can get a contract

13  facility."  Well, you, on his behalf, were extolling the

14  virtues of the Gyst House and saying let him go there until.

15           And so, I'm not really going to give him credit for

16  any problems that the Gyst House has, because he wanted to go

17  there, because he wanted to get out of jail right away, and

18  indicating that he could do fine until we put him into another

19  facility.

20           Obviously, he didn't do well there.  He ends up

21  getting kicked out.  And I understand your argument regarding

22  it wasn't his phone, et cetera.  But just like, you know, a

23  felon can't own or pick up somebody else's gun, he can't -- he

24  shouldn't have been using a phone when he was not privileged

25  to do so.  He should not have put himself in a situation to

1   get kicked out of the Gyst House, because I put him there to

2   tell him to stay there until trial or until I otherwise found

3   another facility for him to go to.  And it didn't work out.  I

4   gave him credit on the other one, and that's why I released

5   him the second time, because I was sympathetic to what

6   happened with his mother and -- and, you know, the things that

7   happened before, and did not want to lock him up.  That's why

8   I gave him that second chance.

9           I am not going to give him a third chance, because I

10  -- I can't trust that he will do any better this time than

11  he's done up to this point, because I've listened to him and

12  believe --

13          THE DEFENDANT:  I promise --

14          THE COURT:  I'm -- sir, please don't do that.

15          THE DEFENDANT:  I promise --

16          THE COURT:  I did not want to lock you up.  I -- I

17  think I showed that by, despite finding that you were in

18  violation, I said I'm going to go ahead -- I was hesitant to

19  let you out to go to the Gyst House because it was not a

20  contract facility, but you didn't want to stay in there until

21  we got a contract facility.  Now you're complaining that

22  because they didn't -- their standards were lower and weren't

23  as good as a contract facility, I should give you credit for

24  that.  I'm not going to do that.

25          So, I'm going to revoke your bond and order you

31

1   detained.

2           Is there anything else we need to take up today?

3           MS. SHIPLEY:  Not from the Government, Your Honor.

4           MR. BYRD:  No, Your Honor.

5           THE COURT:  All right.  We're in recess as to this

6   case.

7           THE DEFENDANT:  Your Honor, please.

8       (Adjournment at 12:23 p.m.)

9           <u>ELECTRONIC SOUND RECORDING CERTIFICATION</u>:

10  I, court approved transcriber, certify that the foregoing is a

11  correct transcript from the official electronic sound

12  recording of the proceedings in the above-entitled matter.

13

14  <u>/s/Robin Warbritton</u>                 <u>August 24, 2021</u>
    Signature of Approved Transcriber    Date

15

16  <u>Robin Warbritton</u>
    Typed or Printed Name

17

18

19

20

21

22

23

24

25